## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | |
|---|---|
| JANE DOE (L.M.H.), AN INDIVIDUAL<br>Plaintiff<br><br>v.<br><br>CHOICE HOTELS INTERNATIONAL SERVICES CORP., CHOICE HOTELS INTERNATIONAL, INC., AND FLORISSANT HOSPITALITY GROUP LLC<br>Defendants | CIVIL ACTION NO: |

## ORIGINAL COMPLAINT

COMES NOW Plaintiff Jane Doe (L.M.H.), by and through the undersigned counsel, and respectfully submits her original complaint for damages and makes the following averments.

## SUMMARY

1.      Jane Doe (L.M.H.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1]

3.      Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[2] Traffickers or 'pimps' use threats, violence, manipulation,

_____

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.
[2] 18 U.S.C. §1591(e)(3).

1

lies, debt, bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

4.    Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

5.    Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

6.    In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

7.    As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (L.M.H.), with minimal risk of detection or interruption.

8.    Defendants continued supporting traffickers, including Jane Doe (L.M.H.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking at its hotel and specifically at the hotel located at 55 Dunn Rd., Florissant, MO 63031 ("Florissant Property"). Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

## PARTIES

9.     Jane Doe (L.M.H.) is a natural person who is currently a resident and citizen of Colorado. She was a minor until October 2017.

10.     L.M.H. is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of causing her, through force, fraud, or coercion, to commit a commercial sex act.

11.     Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of L.M.H.

12.     Defendant Choice Hotels International Services Corp. is a Delaware corporation with its principal place of business in Rockville, MD. It can be served by its registered agent CSC-Lawyers Incorporating Service Company, 221 Bolivar St., Jefferson City, MO 65101.

13.     Choice Hotels International, Inc. is a Delaware corporation. with its principal place of business in Rockville, MD. It can be served by its registered agent United States Corporation Co., 221 Bolivar Street, Jefferson City, MO 65101.

14.     Choice Hotels International Services Corp. and Choice Hotels International, Inc., are referred to collectively herein as the "Choice Brand Defendants" or "Choice."

15.     Upon information and belief, the Choice Brand Defendants, either directly or through the acts of predecessors for which they are responsible, owned, operated, controlled, and/or managed the hotel located at 55 Dunn Rd., Florissant, MO 63031 through the Choice franchising system.

16.     The Choice Brand Defendants will be referred to collectively as "Franchisor Defendants."

17.     Defendant Florissant Hospitality Group LLC is a for-profit company with its principal place of business in St. Louis, Missouri. It can be served by its registered agent, Akkina Murthy, ATTN: Sreemanth Gollamudi, at 55 Dun Rd., Florissant, MO 63031. Upon information and belief at all relevant times it owned, operated, controlled, and/or managed the Florissant Property. Florissant Hospitality Group LLC will be referred to herein as "Franchisee" or "Franchisee Defendant."

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA and 18 U.S.C. § 2255.

19.     In 18 U.S.C. § 2255, Congress authorized any person who, while a minor, was a victim of a violation of 18 U.S.C. § 1591, to sue in any appropriate district court to recover damages. This provision authorizes nationwide service of process and nationwide jurisdiction.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 all Defendants are residents for the Eastern District of Texas for purpose of venue under 28 U.S.C. §§ 1391(c).

## FACTS

I.     **Jane Doe (L.M.H.) was a Victim of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed, and Controlled by Defendants.**

21.     Jane Doe (L.M.H.) is a survivor of sex trafficking. Her trafficking began in 2014 when she was just fourteen years old after becoming a ward of the state and running away.

22.     Her trafficker controlled her through physical violence and force and made her engage in commercial sex acts for his financial benefit. Her trafficker beat her regularly and left visible bruises on her body.

23.     Her trafficker posted advertisements of her for commercial sex services online without her consent.

24.    She did not want to engage in commercial sex acts, but she feared repercussions from her trafficker if she were to leave. Her trafficker engaged in a pattern of control and intimidating and threatening behavior that caused L.M.H. to believe she would face serious harm or physical restraint if she did not comply with their ongoing demand that she engage in commercial sex for their financial benefit.

25.    L.M.H. was not allowed to keep any of the money she made.

26.    L.M.H. was kept under constant surveillance during her trafficking period.

27.    Jane Doe (L.M.H.) was repeatedly trafficked in Defendants' hotel, and each Defendant facilitated her trafficking.

28.    Between 2015 and 2017, Jane Doe (L.M.H.) was trafficked at the Quality Inn located at 55 Dunn Rd., Florissant, MO 63031.

29.    Staff and management at the Florissant Property had a reasonable opportunity to observe L.M.H., who at all relevant times was a minor.

30.    Based on her appearance and general mannerisms, it was clear to hotel staff and management that L.M.H. was a minor. L.M.H. reached the age of 18 in October 2017.

31.    Jane Doe (L.M.H.)'s trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry.[3] These effects were obvious and apparent to the staff and management of the Florissant Property including effects on L.M.H.'s appearance, demeanor, movements throughout the hotel, and her interactions with her trafficker, hotel staff, and others. Observing these effects provided Defendants with notice that L.M.H. was being continually subjected to coercion, control, and exploitation.

---

[3] *See supra* section II and accompanying footnote for discussion of "red flags" of trafficking.

32.     Jane Doe (L.M.H.) remained under the continuous control of her trafficker through at least 2017.

## II.    The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

33.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Defendants knew or should have known regarding the trafficking at their hotel properties, the subject locations and the trafficking of Jane Doe (L.M.H.).

34.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[4] For years, sex traffickers have been able to reap their profits with little risk when attempting to operate within hotels.[5] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[6] Hotels have been found to account for over 90% of the commercial exploitation of children.[7]

35.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

36.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT,

---

[4] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019),https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[5]     *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

[6] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[7] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[8]

37.    Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[9]

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals show signs of physical abuse, restraint, and/or confinement;

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

- Individuals lack freedom of movement or are constantly monitored;

- Individuals avoid eye contact and interaction with others;

- Individuals have no control over or possession of money or ID;

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals have few or no personal items—such as no luggage or other bags;

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appears to be traveling with an older female or male;

---

[8] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).
[9] *See Id.*

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

- Possession of bulk sexual paraphernalia such as condoms or lubricant;

- Possession or use of multiple cell phones; and

- Possession or use of large amounts of cash or pre-paid cards.

38.     The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[10]  From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

39.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[11] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

40.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants

---

[10] Department of Homeland Security, *Blue Campaign Toolkit*,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[11] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[12]

41.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

42.     All Defendants were specifically aware that commercial sex in a hotel environment, involving a "pimp," often is related to sex trafficking. Defendants received training and guidance on this. Defendants knew that the link between commercial sex in a hotel environment and sex trafficking was sufficiently strong that reasonable diligence required treating signs of commercial sex activity, particularly with apparent and obvious involvement of a "pimp," as evidence of potential trafficking. Reasonable diligence required Defendants to avoid benefiting from rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendants were thereby benefiting from the harboring of sex trafficking victims.

43.     The most effective weapon against sexual exploitation and human trafficking is education and training.[13]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[14]

---

[12] *Id.*

[13] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

[14] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

44.    This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[15]   In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

45.    Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

46.    There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged,

---

[15] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.

47.    Defendants' public statements regarding trafficking confirm they are aware of the problem in the hospitality industry. Recognizing the unique vantage point that hotel owners and staff often have to identify potential human trafficking ventures and victims on their properties, several major hotel chains, including franchisors, franchisees, and owner/operators, have told the public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking. For example:

- The Choice Brand Defendants' Board of Directors has been discussing human trafficking issues since at least 2008 when they adopted a Human Rights Policy that condemns human trafficking and publicly commits to raising awareness among hotel staff about trafficking in its hotels.[16]

- The Choice Brand Defendants claim that they started supporting Polaris, a leading non-profit in the fight against trafficking, in 2010.[17] Upon information and belief, prior to L.M.H.'s trafficking period, the Choice Brand Defendants had reviewed and were familiar with Polaris publications regarding trafficking in the hospitality industry, which include detailed recommendations for how hotels can respond to trafficking.

- In November 2010, the Choice Brand Defendants publicly claimed they were partnering with ECPAT-USA to develop a training module to educate hotel management and staff in the prevention of sex trafficking.[18]

---

[16] https://www.Choice Brand Defendantshotels.com/about/responsibility/human-rights-policy

[17] https://www.Choice Brand Defendantshotels.com/about/responsibility/human-rights-policy

[18] *See* Choice Brand Defendants Hotels, Human Rights Policy, available at https://www.Choice Brand Defendantshotels.com/about/responsibility/human-rights-policy; see also ECPAT-USA, Tourism Protection Code of Conduct, available at http://www.ecpatusa.org/code/

48.     Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

49.     Unfortunately, Defendants' promises have proved empty time and again. While Defendants' statements reflect actual knowledge of the problem of sex trafficking at their branded hotels, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking and receiving benefits from that trafficking. Defendants have made the choice, at all levels, to respond inadequately to their knowledge regarding sex trafficking in their hotels. Instead, Defendants have actively chosen to continue to benefit from sex trafficking of victims like L.M.H.

## III.    Sex Trafficking Has Long Been Prevalent at Defendants' Hotel Properties, and Defendants Have Known About It.

50.     Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (L.M.H.)'s trafficking, that sex trafficking was ongoing and widespread at its properties.

### A.    Sex Trafficking at Choice Branded Hotels was well Known by Choice Brand Defendants.

51.     At all relevant times the Choice Brand Defendants adopted a centralized approach to trafficking-related issues at all Choice-branded properties, including Quality Inn properties.

52.     The use of Choice hotels, including Quality Inn properties, for sex trafficking is well known to Choice Brand Defendants. Choice Brand Defendants have known for years that pimps and traffickers use their hotels to carry out their crimes. Scores of news stories dating back for over a decade highlight Defendants' knowledge of such conduct. Choice Brand Defendants knew, or should have known, of the use of Quality Inn branded hotels for sex trafficking ventures.

Dating back to dates prior to the sex trafficking of Plaintiff and continuing thereafter, are notable complaints that put them on notice of the frequent use of Quality Inn hotels including the Florissant Property for commercial sex and other associated illegal activity.

53.    Upon information and belief, the Choice Brand Defendants monitored both news stories and online reviews for indicia of criminal activity, including sex trafficking. Examples of news stories that demonstrate the severity and pervasiveness of prostitution, sex trafficking, and other associated criminal activity at Choice-branded properties, including Quality Inn hotels, include:

- In August 2013, a man was charged with human trafficking after he held a 15-year-old girl against her will at a Quality Inn in Alabama where she was beaten, forced to do drugs, and sold for sex.[19] The man was sentenced to fifty years for human trafficking.[20] A civil lawsuit was later filed against this Quality Inn.[21]

- In August 2013, two people were charged with sex trafficking of children by force or coercion after they recruited and harbored a 16-year-old girl and kidnapped a 19-year-old girl for prostitution at a Quality Inn in South Carolina.[22]

- In April 2014 a man was arrested for human trafficking young women at a Quality Inn in Florida.[23]

- In May 2014 a man was sentenced to 12 years in prison for sex trafficking a child after being arrested at a Quality Inn in Pennsylvania when he was accompanying a minor to a date.[24]

- In February 2015 a 17-year-old girl was being used as a prostitute at a Quality Inn in Massachusetts before police were able to arrest her pimp and return her to state custody.[25]

---

[19] https://www.wsfa.com/story/23118431/shock-after-man-charged-with-human-trafficking-of-girl-in-dothan/
[20] https://www.al.com/news/montgomery/2014/06/houston_county_judge_sentences.html
[21] https://www.al.com/news/birmingham/2017/01/sex_trafficking_survivor_files.html
[22] https://www.wistv.com/story/23048777/two-accused-of-sex-trafficking-children-denied-bond/
[23] https://archive.tcpalm.com/news/vero-beach-man-charged-with-human-trafficking--video-ep-456198732-341865991.html/
[24] https://www.fbi.gov/contact-us/field-offices/pittsburgh/news/press-releases/pittsburgh-man-sentenced-to-12-years-in-prison-for-sex-trafficking-of-a-child
[25] https://www.enterprisenews.com/story/news/2015/02/12/police-arrest-alleged-pimp-in/35171802007/

- In May 2015 two teenagers were rescued at a Quality Inn in Alabama and a man was arrested for human trafficking.[26]

- In September 2015 a man was convicted and sentenced to one year and six months in state prison for attempting to pimp a woman at a Quality Inn in California.[27]

- In October 2015 a man and woman faced felony charges after they coerced a 15-year-old girl into prostitution and held her at a Quality Inn in North Carolina.[28]

- In June 2016 three people were charged with patronizing prostitution following a sting which was conducted at a Quality Inn in Connecticut.[29]

- In September 2016 three people in Kentucky, including a police sergeant, were arrested in connection to a prostitution investigation that began when authorities received a complaint of a female being held against her will at the Quality Inn.[30]

- In January 2017 two men pleaded guilty to human trafficking after running a prostitution ring out of a Quality Inn in Mississippi.[31]

- In May 2017 a man was accused of human trafficking after running the operation out of a room at a Quality Inn in Florida.[32]

- In May 2019 online sex advertisements led to the arrest of eight women, one of which was arrested at a Quality Inn in Warner Robins, Georgia.[33]

- In April 2021, Billings, Montana officers responded to a report of possible commercial sex activity at a Quality Inn which led to the conviction of a Wyoming man. [34]

- In March 2022 a woman was arrested for prostitution and drug charges at a Quality Inn in Leesburg, Florida after undercover officers responded to her online ad.[35]

---

[26] https://www.al.com/news/montgomery/2015/05/2_teenagers_recovered_south_ca.html
[27] https://orangecountyda.org/press/man-sentenced-to-prison-for-attempted-pimping-of-woman-after-having-her-meet-with-an-undercover-officer-whom-he-thought-was-sex/
[28] https://www.wsoctv.com/news/local/two-accused-coercing-teen-prostitution/27246974/
[29] https://patch.com/connecticut/newhaven/new-haven-men-arrested-prostitution-sting-operation-stratford
[30] https://clarksvillenow.com/local/oak-grove-police-sergeant-2-others-arrested-during-prostitution-investigation/
[31] https://www.wjtv.com/news/2-men-plead-guilty-in-human-trafficking-case/
[32] https://www.jacksonville.com/story/news/crime/2017/05/31/jacksonville-man-43-arrested-human-trafficking-charges/15757285007/
[33] https://www.13wmaz.com/article/news/warner-robins-police-warns-prostitution-can-lead-to-other-dangerous-crimes/93-9f0e65a8-ae4e-487d-a9fe-79db262cd8c4
[34] https://nbcmontana.com/news/local/wyoming-man-convicted-for-arranging-for-commercial-sex-in-billings
[35] https://www.leesburg-news.com/2022/03/24/woman-busted-on-prostitution-charge-at-hotel-in-leesburg/

54.    These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Choice branded hotels. Moreover, on information and belief, the Choice Brand Defendants are aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

55.    63.    Upon information and belief, each of the Choice Brand Defendants monitored criminal activity occurring at its branded hotels and were aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the specific property where L.M.H. was trafficked.

56.    Examples of online reviews that confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Choice branded hotels, including Quality Inn properties, over an extended period, include:

- A January 2006 review of a Quality Inn in Orlando, FL states "Dirty, worn carpets with lumps underneath, no blankets on bed, "clean" towels with hair on them, cigarette stains on tubs, roaches in bathroom, stale smoke smell, no tissues, sink knob broken, security locks on doors broken off, poorly repaired hole in bathroom wall, bathroom door dragged on floor and would not shut all the way, hookers in the parking lot approaching members of our group. When i complained, especially about the hookers, I was told there wasn't much they could do and they would "pass on the complaints to the management."[36]

- A July 2006 review of a Quality Inn in Oakland, CA states "we checked into room 219 (in the back of the motel) only to find numerous prostitutes and apparent pimps in the parking lot and some of the first floor rooms. I felt it was a very very unsafe environment and we moved to another motel after only one half hour in the room."[37]

- An August 2009 review of a Quality Inn in Port Allen, LA states "Oh, yea. I was outside having a smoke aboug midnight when two prostitutes began knocking two doors down from us. It seems no one there wanted company, so they began hitting on me until they learned I was with my family."[38]

---

[36] https://www.tripadvisor.com/Hotel_Review-g34515-d17803954-Reviews-Quality_Inn_Suites_Downtown-Orlando_Florida.html
[37] https://www.tripadvisor.com/Hotel_Review-g32810-d80444-Reviews-Quality_Inn_Oakland-Oakland_California.html
[38] https://www.tripadvisor.com/Hotel_Review-g40379-d92936-Reviews-Quality_Inn_Suites_Port_Allen-Port_Allen_Louisiana.html

- A February 2010 review of a Quality Inn in New Orleans, LA states "We checked in late at night following a long drive, not knowing that this hotel was in a seedy part of New Orleans. The parking lot was full of loiterers. There were obvious prostitutes in the lobby, and someone had recently vomited on the elevator. Only one of the lights in the bedroom worked - and there was no door knob on the bathrrom door. There were screams in the hallway during the night.  This hotel is unsafe and not clean."[39]

- An August 2010 review of a Quality Inn in Toledo, OH states "Two 19 year olds were shot in the middle of the night at the convenience store next door and a hooker was sitting on the curb out front of the hotel waiting for "a ride" when we left. This place was a real bummer."[40]

- A November 2010 review of a Quality Inn in New Orleans, LA states "I stayed with a colleague for 1 night on a business trip in the area before checking into another hotel because I was disgusted. There were prostitutes working the hotel that knocked on our door and pretty sure drugs were being sold right out of the room beside mine."

- A May 2011 review of a Quality Inn in Atlanta, GA states "When the security lights went out a prostitute and several thugboys started working the parking lot of the hotel.. I specifically told the manager that I never want to stay away from security again."[41]

- An August 2011 review of a Quality Inn in New Orleans, LA states "We got a room in January 2011, on the ground floor, and it had a stench to it that smelled like someone forgot to take their clothes out of the washer. There were people going into the room next to us that were very suspicious. They were yelling & swearing and we think they were pimps or drug dealers, because we heard one of them yelling at a female telling her that "this is the way I make my money." Needless to say, we left and got our money back. Scary!"[42]

- March 2012 review of a Quality Inn in Payson, UT states "Dirty rooms, rude staff, worst hotel experience ever. And for some reason there were a lot of police cars in the parking lot and they were asking women if they were prostitutes. I wish I was making that up. Apparently it's a good place to get an afternoon delight and Payson is prostitute heavy. I'd never been to Payson before but I didn't think a small town would have this problem. I left as soon as I could in the morning to avoid any officers and/or prostitutes."[43]

---

[39] https://www.tripadvisor.com/Hotel_Review-g60864-d93140-Quality_Inn-New_Orleans_Louisiana.html
[40] https://www.expedia.com/Toledo-Hotels-Quality-Inn-Alexis-Rd.h40044.Hotel-Reviews
[41] https://www.expedia.com/Atlanta-Hotels-Quality-Inn-Atlanta-Northeast-I-85.h15487.Hotel-Reviews
[42] https://www.tripadvisor.com/Hotel_Review-g60864-d93140-Quality_Inn-New_Orleans_Louisiana.html
[43] https://www.yelp.com/biz/quality-inn-payson

- A February 2013 review of a Quality Inn in Downey, CA states "Be aware that there is the potential for some undesirable people around the property. One night we had a drunken woman screaming the the parking lot that she was going to kill herself. Two mornings later we saw what appeared to be a prostitute waiting for visitors in her room with the door proped open half way."[44]

- June 2013 review of a Quality Inn in Lester, PA states "You want a room in the front/lit area. Do NOT take a room in the back/unlit area. We parked there (briefly) and there were people on the balcony/aisle drinking. I mentioned this to the clerk and was told that the back of the building is for the cash customers. I am fairly sure he meant hookers."[45]

- July 2013 review of a Quality Inn in Fresno, CA states "I am pretty sure there was prostitute "working" from the parking lot and I believe she was using the hotel, ew! I brought this to the staffs attention when we were checking out and she just looked at us and said " oh yeah"."[46]

- October 2013 review of a Quality Inn in Atlanta, GA states "…sketchy security foot patrol
hookers come and go parking lot has sketchy characters at night recurring smell of drugs…"[47] Hotel management responded to this review on October 7, 2013.

- February 2014 review of a Quality Inn in San Diego, CA states "I had to stay here for a month for business costs. There was a hooker getting the work done on her what seemed as loud as possible as it happened on at least 5 occasions that woke me from mid sleep. The room had an awful dirty dingy Angel to it. Oh and btw it is located in pretty much a ghetto as with the hooker."[48]

- April 2014 review of a Quality Inn in Charleston, SC states "We had a 2 inch gap underneath our door when it was completely shut, a spider was on the wall. Along with bugs in the framed art, there was obvious prostitution and a dead lizard in the corner. Never go here this place is horrid."[49]

- November 2014 review of a Quality Inn in Vacaville, CA states "This place is a seedy as they come. Pulled up to the room after being on the road for 8 hrs with our kids and realized most of the clientele was either going to or coming from the shady bar in the parking lot. All night people were loud, I swear there was some

---

[44] https://www.tripadvisor.com/Hotel_Review-g32308-d76773-Reviews-Quality_Inn_Near_Downey_Studios-Downey_California.html
[45] https://www.tripadvisor.com/Hotel_Review-g53021-d3491361-Reviews-Quality_Inn_Philadelphia_Airport-Lester_Pennsylvania.html
[46] https://www.yelp.com/biz/quality-inn-and-suites-fresno-northwest-fresno
[47] https://www.tripadvisor.com/Hotel_Review-g60898-d86271-Reviews-Quality_Suites_Atlanta_Buckhead_Village_North-Atlanta_Georgia.html
[48] https://www.tripadvisor.com/Hotel_Review-g60750-d83092-Reviews-Quality_Inn_San_Diego_I_5_Naval_Base-San_Diego_California.html
[49] https://www.expedia.com/Charleston-Hotels-Quality-Inn-Charleston-Gateway.h24247.Hotel-Reviews

prostitution going on. My kids were up scared from all the yelling. They finally fell asleep about 1am and thanks god they did bc around 3 the husband and I woke to very loud sex noises coming from the room next to ours."[50]

- February 2015 review of a Quality Inn in Spokane, WA states "On the first weekend we were there and after returning to the hotel around 10:00 pm we were walking down the hallway entrance to the elevators and approaching us were three apparent prostitutes. The older one made the statement to the two younger ones that "you better not turn down anything tonight" end quote. They walked right by the front desk to get to the front exit door. Any facility that promotes and allows such things to occur in their family oriented facility is not where I will ever bring my family back again."[51] Hotel management responded to this review on February 5, 2015.

- April 2015 review of a Quality Inn in Riverside, CA states "On our third night we were graced by a hooker and a John who didn't even know her name on the side of us. We heard multiple drug deals happen, and I'm not talking about weed... Then they started to fight loudly in the room then took it right outside of our door. I didn't know whether to call the cops or hit the floor."[52]

- May 2015 review of a Quality Inn in Winston Salem, NC states "Wasn't even there 5 minutes after checking in with my sons, when someone was soliciting prostitution to us. Mind you, my kids are 15 and 16 year olds. In other words offering us services."[53]

- September 2015 review of a Quality Inn in Killeen, TX states "I would recommend you stay far from this hotel! Also there is prostitution going on here and it harbors the wrong type of people."[54]

- February 2016 review of a Quality Inn in Hollywood, FL states "HOWEVER, The facility is crawling with prostitutes. They are in the lobby, pool area and common areas. They are not forward and didn't make any maneuvers but had my children been with me their major presence would have been extremely uncomfortable."[55]

- 2017 review of a Quality Inn in Birmingham, AL states "…People slinging drugs and prostitutes all like to meet up here…"[56]

---

[50] https://www.yelp.com/biz/quality-inn-and-suites-vacaville?start=80
[51] https://www.tripadvisor.com/Hotel_Review-g58759-d225255-Reviews-or700-Quality_Inn_Downtown_4th_Avenue-Spokane_Washington.html
[52] https://www.yelp.com/biz/quality-inn-riverside-near-ucr-and-downtown-riverside
[53] https://www.expedia.com/Winston-Salem-Hotels-Quality-Inn-University.h26374.Hotel-Reviews
[54] https://www.expedia.com/Killeen-Hotels-Quality-Inn.h4655354.Hotel-Reviews
[55] https://www.tripadvisor.ca/Hotel_Review-g34296-d313345-Reviews-Quality_Inn_Suites_Hollywood_Boulevard-Hollywood_Broward_County_Florida.html
[56] https://www.google.com/travel/hotels/Quality%20Inn%20155%20Vulcan%20Rd,%20Birmingham,%20AL%2035209%20google/entity/CgsIxrWt5-LmzIO7ARAB/prices?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,45

18

- December 2018 review of a Quality Inn in St. Petersburg, FL states "…prostitutes use the hotel to have sex…"[57]

- 2019 review of a Quality Inn in Brooklyn Center, MN states "If you're looking for hookers or drugs, definitely hit this place up."[58]

- July 2021 review of a Quality Inn in Harvey, IL states "Criminal activity at this location such as prostitution. People living at hotel."[59]

57. These reviews are only representative examples. There are many similar articles and reviews about sex trafficking and other associated criminal activity at Choice-branded hotels.

58. These and other news stories, guest surveys, and online reviews show that the use of Choice and Quality Inn hotels for sex trafficking was not isolated to one hotel property or a single geographic area. The common use of Choice and Quality Inn hotels for sex trafficking became a nationwide problem that stemmed from decisions made at the corporate/franchisor level.

59. Each Defendant knew of the sex trafficking crisis prevalent in the hotel industry generally, as well as specifically at Quality Inn branded hotels, including the subject hotel, and

---

15404,4597339,4723331,4731329,4757164,4778035,4810792,4810794,4814050,4821091,4861688,4864715,48741
90,4886082,4886480,4893075,4902277,4905351,4905599,4906019,4926165,4926489,4927883,4927884,4930751,4
930753,4931360,4934343,4936396,4937897,4941049,47061553&hl=en-
US&gl=us&ssta=1&q=Quality+Inn+155+Vulcan+Rd,+Birmingham,+AL+35209+google&grf=EmQKLAgOEigSJn
IkKiIKBwjnDxABGB8SBwjnDxACGAEgADAeQMoCSgcI5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDg4OD
kxZWI2MDllMDkyNjE6MHhiYjA3MzMzNjJjZWI1YWM2&rp=EMa1refi5syDuwEQxrWt5-
LmzIO7ATgCQABIAcABAg&ictx=1
[57] https://www.tripadvisor.ca/Hotel_Review-g34607-d87622-Reviews-Quality_Inn_Suites_at_Tropicana_Field-
St_Petersburg_Florida.html
[58]
https://www.google.com/travel/hotels/Quality%20Inn%201600%20James%20Cir%20N,%20Minneapolis,%20MN
%2055430%20google/entity/CgsI9ZzzutPn-
eDIARAB/prices?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,451540
4,4597339,4723331,4731329,4757164,4778035,4810789,4810790,4814050,4821091,4861688,4864715,4874190,48
86082,4886480,4893075,4902277,4905351,4906023,4926165,4926489,4931360,4931985,4934306,4934344,49363
96,4937897,47061553&hl=en-
CA&gl=ca&ssta=1&q=Quality+Inn+1600+James+Cir+N,+Minneapolis,+MN+55430+google&grf=EmQKLAgOEi
gSJnIkKiIKBwjnDxACGBsSBwjnDxADGAEgADAeQMoCSgcI5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDU
yYjMzMDUwMjg2ZThlNWY6MHhjOGMxZTczZDM3NWNjZTc1&rp=EPWc87rT5_ngyAEQ9ZzzutPn-
eDIATgCQABIAcABAg&ictx=1
[59] https://www.booking.com/hotel/us/baymont-inn-suites-harvey.html

while Defendants claim not to tolerate such activity, the evidence shows and will show at trial that sex trafficking continued at the Florissant Property frequently and long after the trafficking of the Plaintiff.

60.    Upon information and belief, news stories and reviews establish that, at the time L.M.H. was trafficked at the Florissant Property, the Choice Brand Defendants knew at a minimum:

    a.  The use of its branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

    b.  Commercial sex work occurring at its branded properties involved trafficking and compelled prostitution;

    c.  Their franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at its hotel properties;

    d.  Their efforts, if any, to stop facilitating sex trafficking in Choice branded properties were not effective; and

    e.  They were, by their acts and omissions, facilitating sex trafficking at Choice branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

61.    Despite the mounting evidence that sex trafficking at their properties was ongoing and growing, the Choice Brand Defendants continued to earn revenue through engaging in conduct that they knew or should have known would continue to facilitate that trafficking.

**B. The Choice Brand Defendants and Franchisee had actual and constructive knowledge of widespread and ongoing sex trafficking at the Florissant Property.**

62.    Sex trafficking was widespread and pervasive at the Florissant Property specifically.

63.    The Choice Brand Defendants and Franchisee knew or should have known about the sex trafficking pervasive at the Florissant Property based on obvious indicators of this activity.

64.    Online reviews confirm the pervasiveness of sex trafficking, and associated illegal activities at the Florissant Property and other Missouri Quality Inns:

- 2015 TripAdvisor review from a Quality Inn in Cape Girardeau, MO states "…during my inspection I found the bed covers stained and between the mattress and box spring I found a sex toy from a previous person…"[60]

- 2016 TripAdvisor review from a Quality Inn in Cape Girardeau, MO states "She didn't care when I found a used condom in the room complete with brown bodily fluids… I hate to think what else was in that hotel. I would NOT recommend it to anyone! They made it plain that all they care about is your money."[61]

- 2016 TripAdvisor review from a Quality Inn in Cape Girardeau, MO states "…On two different occasions I was approached by drug dealers. And it seemed to me several of the people staying/living there was under the influence of crystal meth. I informed front desk and was told there was nothing they could do about…."[62]

- 2018 TripAdvisor review of the Florissant Property states "…There was marijuana being smoked in one room as you walked past then you smelled a deodorizer sprayed shortly after. Like someone went down the hall and sprayed. There was very loud sex going on in one room…"[63]

- 2019 Expedia review of the Florissant Property states "…Walls were so thin I heard the people next door having sex."[64]

- 2020 Google review of the Florissant Property states "…plenty of drug dealers around"[65]

---

[60] https://www.tripadvisor.com/Hotel_Review-g44207-d235354-Reviews-Quality_Inn-Cape_Girardeau_Missouri.html
[61] Id.
[62] Id.
[63] https://www.tripadvisor.com/Hotel_Review-g44379-d224409-Reviews-Quality_Inn_Florissant_St-Louis-Florissant_Saint_Louis_Missouri.html
[64] https://www.expedia.com/St-Louis-And-Vicinity-Hotels-Quality-Inn-Florissant-St-Louis.h6396.Hotel-Reviews
[65] https://www.google.com/travel/hotels/Quality%20Inn%2055%20Dunn%20Rd,%20Florissant,%20MO%2063031%20google/entity/CgsI7pzXxpezlNqYARAB/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4926165,4926489,4931360,4934308,4935107,4936396,4937897,4940607,4942346,47061553&hl=en-CA&gl=ca&ssta=1&q=Quality+Inn+55+Dunn+Rd,+Florissant,+MO+63031+google&grf=EmQKLAgOEigSJnIkKiIKBwjnDxAEGB4SBwjnDxAFGAEgADAeQMoCSgcI5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDg3ZGYzNjU1NmJjZDI1MTc6MHg5OGI0NTE5OTc4ZDVjZTZTZTl&rp=EO6c18aXs5TamAEQ7pzXxpezlNqYATgCQABIAcABAg&ictx=1&sa=X&ved=2ahUKEwjM-J_kxvH8AhUMjYkEHeeCD44Q4gl6BAhNEAU

- 2022 Booking.com review of the Florissant Property states "rather interesting with escorts on property its not a good place for kids"[66]

- 2022 Kayak review of the Florissant Property states "…lots of werid people outside druggie"[67]

- 2022 Yelp review of the Florissant Property states "…Halls smell like marijuana. Rough crowd, people screaming in rooms, doors slamming all night. Did not feel safe. Several Uber drivers said it was a prostitution and sketchy hotel. Should be closed down."[68]

65.    A population of traffickers, including Jane Doe (L.M.H.)'s trafficker, repeatedly chose to use the Florissant Property for their sex trafficking activity. They selected this hotel because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. These traffickers followed a repetitive and routine procedure during stays at the Florissant Property. There were obvious signs of this activity, which were consistent with the well-known "red flags" for sex trafficking in the hospitality industry. As such, Defendants also knew or should have known about the pervasive sex trafficking at the Florissant Property based on obvious indicators of this activity.

66.    This population of traffickers, including L.M.H.'s trafficker, operated with little regard for concealment, due to an implicit understanding between Defendants and the traffickers. This understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendants.

67.    There were other victims being trafficked at the Florissant Property at the same time as L.M.H., including other victims being trafficked by the same trafficker, and there were obvious signs these victims were being trafficked.

---

[66] https://www.booking.com/hotel/us/quality-inn-st-louis-northwest-i-270.html
[67] https://www.kayak.com/Florissant-Hotels-Quality-Inn-Florissant-St-Louis.2242190.ksp
[68] https://www.yelp.com/biz/quality-inn-florissant-st-louis-florissant

68.    The conduct of Defendants facilitated trafficking of a number of victims by a population consisting of multiple traffickers at the Florissant Property. Defendants developed a continuous business relationship with this population of traffickers who operated at the hotel on a routine and repetitive basis.

69.    Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Florissant Property prior to Jane Doe (L.M.H.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

70.    All knowledge from the staff at the Florissant Property is imputed to Franchisee, which employed the hotel staff. Thus, Franchisee knew about the widespread and ongoing trafficking at the Florissant Property, including the trafficking of Jane Doe (L.M.H.), through the direct observations of hotel staff, including management-level staff. This knowledge is further imputed to the Choice Brand Defendants based on the existence of an actual agency relationship as described below.

71.    Upon information and belief, in addition to available public sources of information about trafficking and knowledge imputed from the hotel staff and management, Franchisee learned

23

or should have learned about the obvious signs of widespread trafficking at the Florissant Property, based on non-public sources of information including but not limited to:

     a.   surveillance of the property;

     b.   internal investigations;

     c.   customer complaints;

     d.   monitoring of customer feedback;

     e.   information received from law enforcement;

     f.   and other sources of non-public information available to Franchisee.

72.    Upon information and belief, each of the Choice Brand Defendants knew or should have known about the widespread and ongoing trafficking at the Florissant Property, including the trafficking of L.M.H., because of information available through numerous channels, including but not limited to:

     a.   Collection and review of surveillance footage from the Florissant Property by the Choice Brand Defendants;

     b.   The Choice Brand Defendants' protocol that, on its face, required staff of the Florissant Property and Franchisee to report suspected criminal activity and suspected trafficking to the Choice Brand Defendants;

     c.   The Choice Brand Defendants' regular, unannounced inspections of the Florissant Property;

     d.   Information obtained by the Choice Brand Defendants' field-based associates that visited hotels, including the Florissant Property, to discuss human trafficking issues;

     e.   Franchisee and the Choice Brand Defendants' joint involvement in soliciting, monitoring, analyzing, and responding to guest surveys and guest complaints;

     f.   The Choice Brand Defendants' capture, retention, and analysis of extensive data about all aspects of the operation through the backend of systems it required Franchisee to use at the Florissant Property.

73.     Upon information and belief, the Choice Brand Defendants adopted a protocol that, on its face, required hotel staff and the Franchisee to report suspected criminal activity, including suspected prostitution and sex trafficking, to the Choice Brand Defendants. Based on the existence of this protocol and the widespread and obvious trafficking at the Florissant Property, there were, upon information and belief, multiple instances of suspected sex trafficking that were reported to the Choice Brand Defendants.

**C.  Defendants knew Jane Doe (L.M.H.) was being trafficked at the Florissant Property because of the apparent and obvious "red flags" of sex trafficking.**

74.     During the period that Jane Doe (L.M.H.) was trafficked at the Florissant Property, there were obvious signs that her trafficker was engaged in sex trafficking:

   a.  At check in, hotel staff observed Jane Doe (L.M.H.)'s trafficker enter the hotel alone and book more than one room at a time to accommodate the multiple victims he was trafficking.

   b.  Hotel staff would have observed Jane Doe (L.M.H.) with few or no personal items, appear to be malnourished and/or have poor hygiene, and appear emotional, nervous, and scared.

   c.  The hotel rooms in which Jane Doe (L.M.H.) was trafficked were frequently paid for with cash or prepaid cards.

   d.  Hotel staff would have observed Jane Doe (L.M.H.), a minor, high on drugs and alcohol while on the hotel property.

   e.  Hotel staff would have observed Jane Doe (L.M.H.), a minor, staying on the property with her trafficker who was visibly significantly older than her.

   f.  L.M.H. appeared consistent with her age of 15 years old when trafficking first began at the Florissant Property and it was apparent to hotel staff that she was a minor.

   g.  L.M.H.. wore provocative, revealing clothing that was not appropriate for her age.

   h.  Other females were being trafficked with Jane Doe (L.M.H.) by her same trafficker at the Florissant Property.

25

     i.    Jane Doe (L.M.H.), a minor, stayed at the Florissant Property on multiple occasions, often during school hours.

     j.    Jane Doe (L.M.H.) specifically recalls one occasion in which L.M.H., her trafficker, and one of the other trafficking victims got into a heated, loud argument in the parking lot of the Florissant Property. Hotel staff would have observed this occasion, but law enforcement was not called.

     k.    The "Do Not Disturb" door hanger was used very frequently.

     l.    L.M.H. requested extra towels and linens from housekeeping but would often deny staff entry into the room. Hotel staff observed that she was dressed provocatively and was emotional, nervous, and scared.

     m.    Jane Doe (L.M.H.)'s trafficker would post ads for her services on the internet using the hotel's Wi-Fi. In January 2015, photos were taken at this location to be used in ads.

     n.    Several johns entered and left Jane Doe (L.M.H.)'s room at unusual hours and were present at the hotel for brief periods of time.

     o.    There was heavy foot traffic in and out of Jane Doe (L.M.H.)'s room involving men who were not hotel guests. This traffic was visible to hotel staff.

     p.    After Jane Doe (L.M.H.) checked out, hotel cleaning staff would have noticed sex paraphernalia like condom wrappers and lubricant in the room.

     q.    Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

75.     Based upon information and belief, multiple employees at the Florissant Property, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

76.     As such, Defendants knew or were willfully blind to the fact that Jane Doe (L.M.H.) was being trafficked at the Florissant Property.

77.    Given these obvious signs, Franchisor Defendants knew or should have known about the trafficking of Jane Doe (L.M.H.) based on their policies or protocols that required hotel staff to report suspected criminal activity including sex trafficking.

78.    The Franchisor Defendants and Franchisee had constructive knowledge of the trafficking of L.M.H. at the Florissant Property because that trafficking was the direct result of the Franchisor Defendants and Franchisee facilitating trafficking at the Florissant Property.

79.    Based on their knowledge of the problem of sex trafficking in the hotel industry, at Choice branded hotels, and at the Florissant Property, Franchisor Defendants and Franchisee each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the Florissant Property and to make a reasonable investigation in response to signs of potential sex trafficking. If the Defendants had used reasonable prudence, they would have been aware of Jane Doe (L.M.H.)'s trafficking at the Florissant Property and that they were benefiting from such trafficking.

## IV.    Defendants actively facilitated sex trafficking at the Florissant Property, including the trafficking of Jane Doe (L.M.H.)

80.    Defendants had both actual and constructive knowledge of the trafficking of Jane Doe (L.M.H.) at the Florissant Property because the trafficking was the direct result of Defendants facilitating her trafficking at the properties.

### A. Franchisee facilitated the trafficking activity at the Florissant Property, including the trafficking of L.M.H.

81.    Franchisee is responsible for the acts, omissions, and knowledge of employees of the Florissant Property when operating these hotels because these acts and omissions were committed in the scope and course of employment, because Franchisee ratified these acts and omissions, and because Franchisee failed to exercise reasonable care with regard to the hiring,

27

training, and supervision of these employees given the specific risks, known to Franchisee, of human trafficking occurring in the Florissant Property.

82.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Florissant Property, Franchisee continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

83.    Franchisee knew or was willfully blind to the fact that L.M.H. was being trafficked and, despite this, benefited from continued association with her trafficker by providing him a venue in the form of hotel rooms and related services, to facilitate L.M.H.'s sexual exploitation.

84.    Franchisee also facilitated widespread trafficking at the Florissant Property, including the trafficking of L.M.H., in ways including:

   a.  developing relationships with traffickers, including L.M.H.'s trafficker, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

   b.  continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of L.M.H. and other victims;

   c.  allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

   d.  inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

   e.  failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

   f.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

   g.  providing rooms in a designated area of the property that at the end of a back hallway but next to a door that was kept unlocked, thus both allowing ease of access for "johns" but also minimizing risks of detection; and

       h.   accommodating specific requests made by traffickers.

85.    Franchisee's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including L.M.H.

86.    Franchisee knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

87.    Policies purportedly enacted and enforced by Franchisors to identify signs of sex trafficking and stop it from occurring were not properly implemented at the Florissant Property by neither Franchisor Defendants nor Franchisee. L.M.H.'s trafficker was able to continue the trafficking venture at the Florissant Property. Had Franchisor Defendants enforced the policies and procedures they enacted to prevent trafficking from occurring within their branded hotels after observing obvious signs of trafficking as described above, L.M.H.'s trafficking would have been identified and reported, which would have prevented her trafficking at the Florissant Property. Furthermore, had Franchisee Defendant properly followed the franchise policies enacted by Franchisors to identify and prevent trafficking from occurring at branded hotels as described above, L.M.H.'s trafficking would have been identified and reported, which would have prevented her trafficking at the Florissant Property.

**B. The Choice Brand Defendants facilitated the trafficking activity at the Florissant Property, including the trafficking of L.M.H.**

88.    The Choice Brand Defendants directly participated in the rental of rooms at the Florissant Property in ways including but not limited to:

       a.   The Choice Brand Defendants controlled all details of the guest reservation, check-in, and payment processes through its management of and control over all systems used for those processes and through its adoption and enforcement of detailed and

specific policies dictating the means and methods used for the day-to-day implementation of these processes.

b.  The Choice Brand Defendants directly took reservations for rooms at the Florissant Property and accepted payment for those rooms through a central reservation system ("CRS") that it controlled and operated. This CRS included a toll-free telephone reservation system, a proprietary internet site, mobile phone and tablet reservation applications, and interfaces with global distribution systems and other internet reservation sites.

c.  The Choice Brand Defendants could make reservations and take payment for rooms at the Florissant Property without any involvement or approval by Franchisee.

d.  The Choice Brand Defendants directly entered into agreements with third parties regarding the distribution of room inventory in its branded hotels, including its franchised hotels.[69]

e.  When a guest did not make a reservation in advance through the CRS, The Choice Brand Defendants nonetheless controlled the specific process used to register a walk-in guest and generate a reservation for that guest.[70]

f.  The Choice Brand Defendants set or otherwise controlled room prices, required discounts, and reward programs. The Choice Brand Defendants also controlled the room rates offered to each guest.[71]

g.  The Choice Brand Defendants controlled all data related to room rentals; every time someone makes a reservation, checks in, or checks out, the transaction goes directly through The Choice Brand Defendants' data center.[72]

h.  The Choice Brand Defendants controlled and restricted the ability of Franchisees and hotel staff to refuse or cancel a reservation.

i.  The Choice Brand Defendants established detailed policies and protocols that dictated, step-by-step, everything that would happen from the time a guest arrived at the Florissant Property until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

---

[69] https://www.sec.gov/Archives/edgar/data/1046311/000104631117000006/chh1231201610-k.htm
[70] https://www.The Choice Brand Defendantsadvantage.com/cA_Functionality.pdf
[71] https://www.The Choice Brand Defendantsadvantage.com/cA_Functionality.pdf
[72] https://www.raritan.com/resources/case-studies/detail/no-sleepless-nights-for-The Choice Brand Defendants-hotels-data-center-team

     j.   The Choice Brand Defendants required Franchisees to use The Choice Brand Choice ADVANTAGE property management system, which was owned, maintained, and controlled by The Choice Brand Defendants, for virtually all aspects of hotel operations related to room rentals. Through the backend of this system, the Choice Brand Defendants exercised control over day-to-day processes.

     k.   The Choice Brand Defendants maintained back-end access to the Choice ADVANTAGE property management system, which it used to collect, track, and report comprehensive information about each guest at the Florissant Property.

     l.   The Choice Brand Defendants also participated in day-to-day operations regarding reservations by synchronizing the rate and inventory information for the Florissant Property with the CRS and making day-to-day decisions about rates.

89.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Florissant Property, the Choice Brand Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

90.     The Choice Brand Defendants knew or should have known that L.M.H. was being trafficked and, despite this, benefited from continued association with her trafficker by providing them hotel rooms and related services to facilitate Plaintiff L.M.H.' s sexual exploitation.

91.     The Choice Brand Defendants retained control over the details and methods of aspects of the operation of the Florissant Property that are directly relevant to the proliferation of sex trafficking at that property. As a result of this retained control and its direct involvement, they participated in a venture with sex traffickers who were using the Florissant Property as a venue for their trafficking. Moreover, as a result of this retained control, the Choice Brand Defendants had both the opportunity and the duty to prevent L.M.H.'s trafficking. The Choice Brand Defendants directly participated in and retained control over specific aspects of the operation of the Florissant Property related to trafficking by:

     a.   assuming joint responsibility with the franchisee for detecting and preventing human trafficking at the hotel property;

    b.   assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to the franchisor;

    c.   assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

    d.   assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

    e.   employing field-based associates who work with hotels on trafficking issues;

    f.   assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

    g.   establishing systems for guests to report security issues to the Choice Brand Defendants;

    h.   requiring franchisees to provide Wi-Fi/internet access to guests;

    i.   mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

    j.   setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

    k.   requiring franchisees to use a system to monitor and track housekeeping requests;

    l.   setting policies for when and how housekeeping services are provided;

    m.   collecting and monitoring data that shows patterns of use of housekeeping services.

92.    The Choice Brand Defendants had a direct business relationship with traffickers operating at the Florissant Property because, among other things, the Choice Brand Defendants directly rented rooms at the hotels, directly received payment, and received real-time guest information. Traffickers further developed a business relationship with the Choice Brand Defendants by developing brand loyalty and intentionally choosing Choice hotels because it was known they created a favorable environment for trafficking.

93.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Florissant Property, the Choice Brand Defendants continued operating the

Florissant Property in a way that they knew or should have known would result in facilitating additional sex trafficking at these hotels, including by:

  a.  adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including L.M.H.'s trafficker, to secure rooms without providing their own identifying information;

  b.  adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including L.M.H.'s trafficker, to pay for rooms using non-traceable methods;

  c.  adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

  d.  adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

  e.  providing traffickers continued access to Franchisor-maintained internet systems despite having or constructive knowledge this access was being used for advertising services related to their trafficking activities;

  f.  adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at the Florissant Property;

  g.  implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

94.    But for the Choice Brand Defendants' failure to exercise ordinary diligence when operating and controlling the Florissant Property, including when exercising control over staff training and response to suspected criminal activity on property, they would have known that L.M.H. was being trafficked there. Thus, constructive knowledge of L.M.H.'s trafficking is imputed to the Choice Brand Defendants.

95.    If the Choice Brand Defendants had exercised reasonable diligence when operating the Florissant Property, the Choice Brand Defendants would have prevented this hotel from being

33

used to facilitate widespread and ongoing sex trafficking, including the trafficking of L.M.H., and would not have benefited from that trafficking. Instead, the Choice Brand Defendants engaged in a course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of L.M.H., resulting in financial benefit to the Choice Brand Defendants.

96.    The Choice Brand Defendants should have known about L.M.H.'s trafficking because it retained control over the training of the staff of the Florissant Property regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel facilities for sexual exploitation and human trafficking. If the Choice Brand Defendants had exercised reasonable diligence in providing training, they would have known about the obvious and apparent sex trafficking, including the trafficking of L.M.H. at the Florissant Property. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Choice Brand Defendants.

97.    The Choice Brand Defendants should have known about L.M.H.'s trafficking because they also retained control over the response of Choice hotels to human trafficking, including development of policies and procedure regarding detection, disruption of and response to human trafficking. By failing to exercise reasonable diligence in discharge of this duty, the Choice Brand Defendants facilitated sex trafficking, including the sex trafficking of L.M.H. in their hotel. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Choice Brand Defendants.

98.    The Choice Brand Defendants also should have known about L.M.H.'s trafficking because they retained the control to adopt and enforce policies on sex trafficking for their properties, including Florissant Property, adopted and enforced inadequate and inappropriate check-in, payment, and identification policies, which facilitated trafficking at the Florissant

34

Property. The Choice Brand Defendants and allowed traffickers to access rooms for the purpose of harboring their victims, including L.M.H. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Choice Brand Defendants.

99.    The Choice Brand Defendants also should have known about L.M.H.'s trafficking because they retained control over the security of the Florissant Property through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing and responding to customer complaints, and inspecting the Florissant Property. They also collected data regarding hotel operations and customers, including names, payment information, payment method, reservation history, wi-fi browsing data, and other details associated with their stay. If the Choice Brand Defendants had used reasonable prudence in monitoring and reviewing this information, they would have known about the ongoing trafficking. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to they Choice Brand Defendants.

100.    L.M.H. exhibited the kind of obvious signs of sex trafficking that would have been detectable and detected if the Choice Brand Defendants had used reasonable diligence in the aspects of hotel operations over which they retained control.

101.    Moreover, L.M.H.'s trafficker was able to operate without interference and without making significant effort at a concealment during repeated visits to the Florissant Property over an extended period because the Choice Brand Defendants adopted policies and practices that insulated L.M.H.'s trafficker from significant risk of detection or disruption.

102.    The Choice Brand Defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including L.M.H.

103.    The Choice Brand Defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

## V.    Choice Brand Defendants and Franchisee's ventures at the Florissant Property

104.    Each of the Choice Brand Defendants generated substantial income from the Florissant Property, receiving a share of the profits from room rentals collected at the hotel. The fees generated by the Choice Brand Defendants were primarily based on gross room rentals; therefore, the Choice Brand Defendants' profits increased with each room rental at the Florissant Property, including each room rented to a trafficker. Revenue generated from rooms rented at the Florissant Property was distributed among the Choice Brand Defendants, with each benefiting from each rental of a hotel room to a trafficker, including L.M.H.'s trafficker.

105.    Franchisee profited from every room rented to a trafficker or for use in trafficking at the Florissant Property, both from the room fee and from fees for other hotel services.

106.    In ways described more fully above, the Choice Brand Defendants and Franchisee knowingly received a financial benefit from participating in a venture, in the form of a continuous business relationship and implicit understanding, the population of sex traffickers operating out of the Florissant Property, including L.M.H.'s trafficker. (hereinafter "Venture 1").

107.    The Choice Brand Defendants and Franchisee formed this continuous business relationship and implicit understanding with the traffickers at the Florissant Property by continuing to rent rooms to be used for trafficking (including L.M.H.'s trafficking) after the Choice Brand Defendants and Franchisee knew or should have known that the rooms were being used for unlawful trafficking.

108.    This business relationship involved mutual pursuant of financial benefit: the traffickers were renting the hotel rooms to generate revenue from sex trafficking, and the Choice Brand Defendants and Franchisee were generating revenue by renting the hotel rooms.

109.    This implicit understanding developed because sex traffickers, including L.M.H.'s, frequently used the Florissant Property for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the Choice Brand Defendants and Franchisees that created a favorable environment for sex trafficking to flourish.

110.    Both the Choice Brand Defendants and Franchisee participated in this venture by acting jointly to rent rooms to traffickers and to operate the hotel in a way that attracted business from traffickers and facilitated their trafficking activity. As further described above, Franchisee provided "boots on the ground" at the hotel, and the Choice Brand Defendants played a primary role in renting rooms at the Florissant Property and retained control over and was directly involved in aspects of hotel operations related to sex trafficking.

111.    The Choice Brand Defendants and Franchisee participated in the venture by continued renting rooms to traffickers, including L.M.H.'s, after they knew or should have known that victims like Jane Doe L.M.H. were being subjected to unlawful trafficking. They also continued operating the hotel in a way that they knew or should have known would encourage traffickers to select the Florissant Property as a venue for their illegal activities.

112.    Choice Brand Defendants and Franchisees did not only provide these traffickers with a physical space (harboring) where they could imprison victims and sell them "johns" (providing), but they also provided these traffickers with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was

37

done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

    a.  The population of traffickers, including L.M.H.'s, that were familiar to the staff at the Florissant Property;

    b.  These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at the Florissant Property but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;

    c.  Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

    d.  Defendants provided additional services to traffickers (including L.M.H.'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

113.    The criminal traffickers operating at the Florissant Property as part of Venture 1 violated 18 U.S.C. §1591 as to victims including L.M.H.

114.    If Choice Brand Defendants and Franchisee had not continued participating in a venture that they knew or should have known engaged in violations of the TVPRA, they would not have received a benefit from L.M.H.'s trafficking at the Florissant Property.

115.    In ways described more fully above, the Choice Brand Defendants and Franchisee also knowingly received a financial benefit from participating in a commercial hotel-operating venture at the Florissant Property (hereinafter "Venture 2").

116.    The Choice Brand Defendants and Franchisee had a longstanding business relationship pursuant to which they jointly participated in operation of the Florissant Property with a shared goal of maximizing revenue, including gross room revenue.

117.    The Choice Brand Defendants and Franchisee, through their respective roles in hotel operations as described above, facilitated widespread sex trafficking at the Florissant

Property by continuing to operate the hotel in a way that they knew or should have known resulted in them benefiting from significant sex trafficking occurring on site at this hotel.

118.    Venture 2 was engaged in a violation of the TVRPA through the widespread sex trafficking at the Florissant Property, which resulted in L.M.H. and other victims being harbored, maintained, and provided in the rooms of the Florissant Property. Venture 2 also engaged in a violation of the TVPRA through the actions of Franchisee who violated the TVPRA as a perpetrator by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

119.    Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Choice Brand Defendants and Franchisee participated in the venture by continuing to operate the Florissant Property in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of L.M.H. The Choice Brand Defendants continued Franchisee with operational support, use of trademarks, marketing services, and other resources to operate the Florissant Property in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).

## VI.    Franchisee Defendant and the Staff at the Florissant Property Acted as Actual Agents of the Choice Brand Defendants.

120.    The Choice Brand Defendants are vicariously liable for the acts, omissions, and knowledge of Franchisee and staff at the Florissant Property, which are the Choice Brand Defendants' actual agents or subagents.

121.    The Choice Brand Defendants subjected Franchisee to detailed standards and requirements regarding the operation of the Florissant Property through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols,

directives, mandates, and expectations imposed by the Choice Brand Defendants that oversaw and supervised hotel operations.

122.    The Choice Brand Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, these standards, protocols, and requirements:

a.  did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee used at the Florissant Property; and

b. covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishing, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

c. dictated the specific manner in which Franchisee and hotel staff must carry out most day-to-day functions at the Florissant Property; and

d. significantly exceeded what was necessary for the Choice Brand Defendants to protect registered trademarks.

123.    In addition to the ways described above, upon information and belief, the Choice Brand Defendants exercised and reserved the right to exercise systemic and pervasive control over Franchisee's day-to-day operation of the Florissant Property, including the following ways:

a. The Choice Brand Defendants required Franchisee and management of the Florissant Property to participate in mandatory training programs, both during onboarding and on an annual basis, regarding all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Choice Brand Defendants to protect its trademarks.

b. The Choice Brand Defendants retained the right to mandate and control training for hotel staff and actually maintained and controlled training for hotel staff on topics it selected.

c. The Choice Brand Defendants controlled the details of training conducted for hotel staff by Franchisee by requiring the use of standardized training methods and materials, including developing online, role-specific training that Franchisees was required to use.

40

d.  The Choice Brand Defendants adopted detailed job descriptions for each position at the Florissant Property and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so.

e.  The Choice Brand Defendants set required staffing levels for the Florissant Property.

f.  The Choice Brand Defendants exercised significant control over the procurement decisions of Franchisees by requiring it to buy products from "qualified vendors" and limiting its ability to purchase products from other vendors.

g.  The Choice Brand Defendants imposed and enforced detailed requirements for all aspects of hotel facilities.

h.  The Choice Brand Defendants controlled channels for guests to report complaints or provide feedback regarding the Florissant Property and directly participated in the response and/or supervised and dictated Franchisee's response to customer complaints or other feedback.

i.  The Choice Brand Defendants required the Florissant Property to participate in a mandatory guest complaint resolution system operated, managed, and overseen by the Choice Brand Defendants.

j.  The Choice Brand Defendants required Franchisee to join and participate in a Franchisees association with other the Choice Brand Defendants brand hotels.

k.  The Choice Brand Defendants controlled all marketing for the Florissant Property, including all website pages, and prohibited Franchisee from using any website, social media, advertising, or other public communication without written approval from the Choice Brand Defendants.

l.  The Choice Brand Defendants required Franchisee to refer all guests who it could not accommodate to other the Choice Brand Defendants-branded hotels.

m.  The Choice Brand Defendants required Franchisee to purchase insurance and set specific requirements for that insurance.

n.  The Choice Brand Defendants imposed detailed recordkeeping and reporting requirements on Franchisee regarding virtually all aspects of hotel operation.

o.  The Choice Brand Defendants collected, monitored, and analyzed dozens of reports regarding the Florissant Property through the backend of the Choice Brand Choice ADVANTAGE property management system and used these reports to supervise and control the day-to-day operations of the Florissant Property.

p.  The Choice Brand Defendants collected, monitored, and analyzed guest information in two separate systems: the CIS (Customer Information System) and

the GIS (Guest Insight System) through the backend of the Choice Brand Choice ADVANTAGE property management system and used this information to supervise, monitor, manage, and control the day-to-day operations of the Florissant Property.

q.  The Choice Brand Defendants retained the virtually unlimited right to supervise the day-to-day operations of the Florissant Property by retaining the right to implement any automatic reporting systems it elected to use.

r.  The Choice Brand Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

s.  The Choice Brand Defendants retained the right to inspect the Florissant Property, including through unannounced inspections.

t.  The Choice Brand Defendants retained the right to impose penalties, including but not limited to written warnings, payment of re-inspection, non-compliance, and guest satisfaction fees, attendance at mandatory training programs and ultimately to the termination of the franchise agreement, on Franchisee for violations of any rule, policy, or standard promulgated by the Choice Brand Defendants.

u.  Other actions that deprived Franchisee of independence in the business operations of the Florissant Property.

124.    The Choice Brand Defendants specifically retained control of the day-to-day operation of Franchisee with regards to aspects of operation of the subject the Florissant Property that caused L.M.H.'s harm, including but not limited to reservation policies and procedures, staff training, security policies, and training, education policies, and procedure regarding human trafficking.

125.    Upon information and belief, the Choice Brand Defendants had the right to and did enforce its control over the Franchisee through various methods, including:

a.  the right to conduct detailed inspections of the Florissant Property;

b.  monitoring or auditing the Franchisee for compliance with policies and expectations;

c.  directing the Franchisee to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

42

    d.   mandating training and education for franchisees and/or hotel staff in response to deficiencies;

    e.   employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

    f.   the right to impose fines or penalties;

    g.   the right to impose additional conditions on franchisee or to restrict or limit its right to provide goods and services;

    h.   the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

126.    At all relevant times, Franchisee acted as the actual agents of the Choice Brand Defendants when operating the Florissant Property.

## VII.   Choice Brand Defendants are jointly responsible for the trafficking of Jane Doe (L.M.H.)

127.    Upon information and belief, the rights, and obligations with respect to the operation, franchising, and control of the Florissant Property were shared and fulfilled jointly by the Choice Brand Defendants.

128.    Upon information and belief, at all relevant times, the Choice Brand Defendants, shared a headquarters, corporate officers, employees, and other resources related to franchising, operation, and control of the Florissant Property.

129.    Upon information and belief, at all relevant times, the Choice Brand Defendants acted jointly to adopt and enforce policies, procedures, and standards for the Florissant Property, to participate in and supervise day-to-day operations at those properties, and to rent rooms at those properties.

130.    Upon information and belief, each of the Choice Brand Defendants shared in and benefited from revenue generated from franchising, operation, and control of the Florissant Property and received a direct benefit when a room was rented to a trafficker at this hotel property.

131.    Upon information and belief, each of the Choice Brand Defendants—through its individual acts and omissions and through its joint acts and omissions with other Choice Brand Defendants—knowingly benefited from participating a venture that it knew or should have known was engaged in a violation of the TVPRA.

132.    Moreover, upon information and belief, each of the Choice Brand Defendants participated in a joint venture with the other Choice Brand Defendants regarding the operation, control, and franchising of the Florissant Property. The Choice Brand Defendants, who were corporate affiliates subject to common ownership and control, were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other Choice Brand Defendants.

**VIII.   Defendants are Jointly and Severally Liable for Jane Doe (L.M.H.)'s Damages.**

133.    The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (L.M.H.).

134.    Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (L.M.H.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## <u>CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA</u>

135.    Jane Doe (L.M.H.) incorporates all other allegations.

**I.    Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Franchisee)**

136.    Jane Doe (L.M.H.) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

44

137.    Franchisee is a perpetrator within the meaning of 18 U.S.C §1595(a) because it:

    a.    violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals (including Jane Doe (L.M.H.)) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at their respective hotel properties.

    b.    violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at their respective hotel properties.

## II.    Cause of Action: Beneficiary Liability under §1595(a) of the TVPRA (all Defendants).

138.    Jane Doe (L.M.H.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

139.    L.M.H. is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

140.    All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as further described above, each Defendant knowingly benefitted, by receiving additional revenue and other benefits, from its participation in a venture the Defendants knew or should have known was engaged in a violation of the TVPRA.

141.    **Venture 1:** Through acts and omissions more fully described throughout this Complaint, each Defendant received a financial benefit from participating a venture with sex

traffickers, including L.M.H.'s trafficker. Each Defendant violated the TVPRA through its participation, as a beneficiary, in Venture 1 as follows:

    a. Venture 1 resulted when Defendants developed and maintained a continuous business relationship and implicit understanding with sex traffickers at the Florissant Property by renting them hotel rooms and providing them related services despite the fact that each Defendant knew or should have known these traffickers were using the Florissant Property to engage in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2), including the trafficking of L.M.H.

    b. This venture violated the TVPRA through the conduct of the traffickers who repeatedly exploited victims, including L.M.H., in the rooms of the Florissant Property.

    c. Each Defendant knew or should have known Venture 1 engaged in violations of the TVPRA.

    d. Each member of Venture 1 pursued the purpose of generating revenue through this continuous business relationship. Traffickers (including L.M.H.'s trafficker) rented rooms to earn profits by exploiting trafficking victims (including L.M.H.). Each Defendant received a financial benefit every time a trafficker rented a room.

    e. Each Defendant participated in the venture by continually renting rooms to traffickers, creating a favorable environment for trafficking, and providing a venture where traffickers could continue to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of trafficking (including L.M.H.'s trafficking).

142. **Venture 2**: Through acts and omissions more fully described throughout this complaint, the Franchisor Defendants received a financial benefit from participating in Venture 2 with Franchisee Defendants operating the Florissant Property. Each of the Franchisor Defendants violated the TVPRA through participation, as a beneficiary, in Venture 2 as follows:

    a. Venture 2 is a commercial venture that resulted from the business relationship between each Franchisor Defendant during its respective time as franchisor for the Florissant Property and Franchisee to operate the Florissant Property with a common objective of maximizing revenue at the hotels, including gross room revenue.

    b. The venture violated the TVPRA through the widespread sex trafficking that occurred at the Florissant Property, including the trafficking of L.M.H. This venture also violated the TVPRA through the conduct of Franchisee, who violated 18 U.S.C §1591(a) as a perpetrator.

  c. Each Franchisor Defendant, at the relevant time, knew or should have known Venture 2 was engaged in violations of the TVPRA.

  d. Each Franchisor Defendant knowingly benefited from this venture through the management fees, royalty fees, reservation fees, marketing fees, and other ancillary fees from the operation of the Florissant Property, which increased every time a room was rented including rooms rented to traffickers.

  e. Each Franchisor Defendant, at the relevant time, participated in this venture by (1) continuing the ongoing business relationship with Franchisee despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the hotel; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

143. The ventures in which each Defendant participated were a direct, producing, and proximate cause of the injuries and damages to L.M.H.

## III. Cause of Action: Liability under 18 U.S.C. § 2255

1. While a minor, Plaintiff was a victim under 18 U.S.C. §1591 and is thus entitled to bring a civil action under 18 U.S.C. § 2255.

2. Florissant Hospitality Group LLC is liable to Plaintiff under 18 U.S.C. § 2255 because, as alleged above, Florissant Hospitality Group LLC is a perpetrator under 18 U.S.C. §1591.

3. Each of the Defendants are liable to Plaintiff under 18 U.S.C. § 2255 because, as alleged above, each Defendant is liable as a beneficiary under 18 U.S.C. §1595(a).

## IV. Cause of Action: Vicarious Liability for Violations of TVPRA and §2255 (Franchisor Defendants).

144. Franchisee acted as the actual agents of Franchisor Defendants when operating the Florissant Property. The agency relationship between Franchisee and each Franchisor Defendant lasted for the period during which the Franchisor Defendants was involved in operation of the Florissant Property through its role as franchisor.

145.    Through the acts and omissions described throughout this Complaint, each Franchisor Defendant, at the relevant time, exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee to operate the Florissant Property.

146.    Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent and its subagents.

147.    While acting as an actual agent of the Choice Brand Defendants, Florissant Hospitality Group LLC violated the TVPRA as both a beneficiary and a perpetrator and violated 18 U.S.C. § 2255.

148.    The Choice Brand Defendants are vicariously liable for the TVPRA violations and the 18 U.S.C. § 2255 violations of Florissant Hospitality Group LLC.

149.    As a result of the relationship between Franchisee and Franchisors, Franchisors are vicariously liable for the acts of Franchisee, including at the Florissant Property. Factors that support this allegation are that Franchisors shared profits, standardized employee training, standardized and strict rules of operations, Franchisors controlled pricing and reservations, regularly conducted inspections, operational support and control, and other acts described above. Finally, Franchisors had the right to terminate any franchisee that failed to comply with the requirements promulgated by Franchisors. Thus, Franchisors retained control, or the right to control, the mode and manner of work contracted for.

150.    As alleged above, Franchisee is directly liable to L.M.H. for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C §1595(a). The Franchisor Defendants are vicariously liable to L.M.H. for those same violations.

151.    Each Defendant's failure to train and supervise their agents and employees, which was unreasonable in light of the known risk of sex trafficking at the Florissant Property, enabled and contributed to the sex trafficking of L.M.H.

## TOLLING OF LIMITATIONS

152.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (L.M.H.) invokes the discovery rule. At the time she was harmed and through at least 2017, Jane Doe (L.M.H.) was under coercion and control of trafficker who abused and manipulated her. Thus, Jane Doe (L.M.H.) did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her trafficker, Jane Doe (L.M.H.)—through no fault of her own—lacked the information to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of L.M.H. being kept under the control of her trafficker, which Defendants facilitated.

153.    At the time Jane Doe (L.M.H.) was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being trafficked at Defendants' hotels or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed.

154.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (L.M.H.) invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Jane Doe (L.M.H.) faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Jane Doe (L.M.H.) filed this lawsuit.

155.    As a result of her continuous trafficking through at least 2017, Jane Doe (L.M.H.) was beaten, sexually assaulted, and mentally abused. She lacked the mental capacity to recognize the extent and scope of her injuries or those responsible particularly those who financially benefited from her trafficking but may not have been seen to be directly involved.

156.    Jane Doe (L.M.H.) was under the continuous control of her trafficker through at least 2017. As a result, she did not have the freedom to investigate her claims, to identify those responsible or to seek legal representation necessary to pursue her legal rights.

157.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (L.M.H.) also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert, across the subject locations.

158.    Jane Doe (L.M.H.) was subject to continuous trafficking at the subject hotel through at least 2017, which is not more than 10 years before Jane Doe (L.M.H.) filed this lawsuit.

159.    This continuous trafficking resulted from Defendants' continuous facilitating of trafficking at the subject hotel and Defendants' ongoing venture with one another and with criminal traffickers.

## **DAMAGES**

160.    Defendants' acts and omissions, individually and collectively, caused Jane Doe (L.M.H.) to sustain legal damages.

161.    Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (L.M.H.).

162.    Jane Doe (L.M.H.) is entitled to be compensated for personal injuries and economic damages, including:

a.  Actual damages (until trial and in the future)

b.  Incidental and consequential damages (until trial and in the future);

c.  Mental anguish and emotional distress damages (until trial and in the future);

d.  Lost earnings and lost earning capacity (until trial and in the future);

e.  Necessary medical expenses (until trial and in the future);

f.  Life care expenses (until trial and in the future);

g.  Physical pain and suffering (until trial and in the future);

h.  Physical impairment (until trial and in the future);

i.  Emotional impairment (until trial and in the future);

j.  Exemplary/Punitive damages;

k.  Attorneys' fees; and

l.  Costs of this action.

m.  Pre-judgment and all other interest recoverable.

## **JURY TRIAL**

163.    Jane Doe (L.M.H.) demands a jury trial on all issues.

## **RELIEF SOUGHT**

164.    WHEREFORE, Jane Doe (L.M.H.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (L.M.H.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (L.M.H.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

**PROVOST ✶ UMPHREY LAW FIRM, L.L.P.**

By: */s/ Bryan O. Blevins, Jr.*
BRYAN O. BLEVINS, JR.
Texas Bar No. 02487300
MATTHEW C.  MATHENY
Texas Bar No. 24039040
COLIN D. MOORE
Texas Bar No. 24041513
CLAIRE BROWN
Texas Bar No. 24108010
ASHLYNN K. ALEXANDER
Texas Bar No. 24137302
350 Pine Street, Ste. 1100
Beaumont, TX 77701
(409) 835-6000 Telephone
bblevins@pulf.com
mmatheny@pulf.com
cmoore@pulf.com
cbrown@pulf.com
aalexander@pulf.com

**ATTORNEYS FOR PLAINTIFF**